UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JUDICIAL WATCH, INC., <br><br> *Plaintiff*, <br><br> v. <br><br> U.S. DEPARTMENT OF STATE, <br><br> *Defendant*. | Civil Action No. 18-300 (TJK) |

## **MEMORANDUM OPINION**

Plaintiff Judicial Watch made a Freedom of Information Act request for records about any requests by former Ambassador to the United Nations Samantha Power for intelligence reports related to Russia's attempts to influence the 2016 presidential election and other associated matters. Both Plaintiff and Defendant Department of State have moved for summary judgment. Because Defendant has more than adequately justified its *Glomar* response, its motion will be granted, and Plaintiff's motion will be denied.

### I. Background

In October 2017, Plaintiff submitted a request under the Freedom of Information Act (FOIA), 5 U.S.C. § 552, to the Department of State ("State") for the following categories of records:

First, "[a]ny and all requests for information, analyses, summaries, assessments, transcripts, or similar records submitted to any Intelligence Community member agency by former United States Ambassador to the United Nations Samantha Powers [sic] concerning, regarding, or relating to" (a) "[a]ny actual or suspected effort by the Russian government or any individual acting on behalf of the Russian government to influence or otherwise interfere with the 2016 presidential election"; (b) "[t]he alleged hacking of computer systems utilized by the

Democratic National Committee and/or the Clinton presidential campaign"; (c) "[a]ny actual or suspected communication between any member of the Trump presidential campaign or transition team and any official or employee of the Russian government or any individual acting on behalf of the Russian government"; and (d) "[t]he identities of U.S. citizens associated with the Trump presidential campaign or transition team who were identified pursuant to intelligence collection activities." ECF No. 8-2 at 1.

Second, "[a]ny and all records or responses received by former United States Ambassador to the United Nations Samantha Powers [sic] and/or any employee, staff member, or representative of United States Mission to the United Nations in response to" those requests. *Id.* at 1–2.

Third, "[a]ny and all records of communication between any official, employee, or representative of any Intelligence Community member agency and former United States Ambassador to the United Nation Samantha Powers [sic] and/or any employee, staff member, or representative of the United States Mission to the United Nations" related to those requests. *Id.* at 2.

On February 9, 2018, Plaintiff filed this action without having received a response to its request. ECF No. 1. And in May 2018, State provided a *Glomar* response, declining to confirm or deny the existence of the requested records because, it asserted, doing so would itself reveal classified information protected by FOIA Exemptions 1 and 3.[1] ECF No. 8-4. The next month,

---

[1] This type of FOIA response received its name from *Phillippi v. CIA*, 546 F.2d 1009 (D.C. Cir. 1976), in which the CIA refused to confirm or deny whether records existed relating to a ship named *Hughes Glomar Explorer*. *See Wolf v. CIA*, 473 F.3d 370, 374 (D.C. Cir. 2007).

State moved for summary judgment on those grounds. ECF No. 8. And the month after that, Plaintiff moved for summary judgment as well. ECF No. 9.[2]

## II. Legal Standard

To prevail on a motion for summary judgment, a movant must show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). FOIA requires federal agencies to "disclose information to the public upon reasonable request unless the records at issue fall within specifically delineated exemptions." *Judicial Watch, Inc. v. FBI*, 522 F.3d 364, 365–66 (D.C. Cir. 2008); *see also* 5 U.S.C. § 552(a)(3)(A). Thus, a FOIA defendant is entitled to summary judgment if it shows that there is no genuine dispute "that each document that falls within the class requested either has been produced, is unidentifiable or is wholly exempt from the Act's inspection requirements." *See Weisberg v. Dep't of Justice*, 627 F.2d 365, 368 (D.C. Cir. 1980) (quoting *Nat'l Cable Television Ass'n, Inc. v. FCC*, 479 F.2d 183, 186 (D.C. Cir. 1973)). The "vast majority of FOIA cases" are decided on motions for summary judgment. *See Brayton v. Office of the U.S. Trade Rep.*, 641 F.3d 521, 527 (D.C. Cir. 2011).

An agency "may refuse to confirm or deny the existence of records where to answer the FOIA inquiry would cause harm cognizable under an FOIA exception." *Gardels v. CIA*, 689

---

[2] In reaching its conclusion, the Court considered all relevant filings, including, but not limited to, the following: Plaintiff's Complaint, ECF No. 1; Defendant's Answer, ECF No. 5; Defendant's Motion for Summary Judgment ("Def.'s Mot."), ECF No. 8; Plaintiff's Consolidated Brief in Opposition to Defendant's Motion for Summary Judgment and in Support of Its Cross-Motion for Summary Judgment ("Pl.'s Mot."), ECF No. 9-1; Defendant's Opposition to Plaintiff's Cross-Motion for Summary Judgment and Reply in Support of Defendant's Motion for Summary Judgment, ECF No. 11; and Plaintiff's Reply Brief, ECF No. 13.

F.2d 1100, 1103 (D.C. Cir. 1982). In that circumstance, a *Glomar* response is "proper if the fact of the existence or nonexistence of agency records falls within a FOIA exemption." *Wolf*, 473 F.3d at 374. To determine whether a *Glomar* response "fits a FOIA exemption, courts apply the general exemption review standards established in non-*Glomar* cases." *Id*. An agency issuing a *Glomar* response must explain in as much detail as possible why it cannot confirm or deny the existence of certain records or categories of records, which it may seek to do by affidavit. *James Madison Project v. Dep't of Justice*, 208 F. Supp. 3d 265, 283 (D.D.C. 2016). If a *Glomar* response is justified, "the agency need not conduct any search for responsive documents or perform any analysis to identify segregable portions of such documents." *People for the Ethical Treatment of Animals v. Nat'l Insts. of Health, Dep't of Health & Human Servs.*, 745 F.3d 535, 540 (D.C. Cir. 2014).

III. Analysis

  A. Exemption 1

Exemption 1 provides that matters that are "specifically authorized under criteria established by an Executive [O]rder to be kept secret in the interest of national defense or foreign policy and . . . are in fact properly classified pursuant to such Executive [O]rder" are exempt from disclosure. 5 U.S.C. § 552(b)(1). While the burden is on the agency to sustain any asserted exemption, *id.* at § 552(a)(4)(B), the D.C. Circuit has advised courts to accord substantial deference to an agency's *Glomar* response when the information requested "implicat[es] national security, a uniquely executive purview." *Elec. Privacy Info. Ctr. v. NSA*, 678 F.3d 926, 931 (D.C. Cir. 2012) (alteration in original) (quoting *Ctr. for Nat'l Sec. Studies v. Dep't of Justice*, 331 F.3d 918, 926–27 (D.C. Cir. 2003)). "[T]he text of Exemption 1 itself suggests that little proof or explanation is required beyond a plausible assertion that information is properly

4

classified." *Morley v. CIA*, 508 F.3d 1108, 1124 (D.C. Cir. 2007). "Ultimately, an agency's justification for invoking a FOIA exemption is sufficient if it appears 'logical' or 'plausible'" in the national security context. *Wolf*, 473 F.3d at 374–75 (quoting *Gardels*, 689 F.2d at 1105).

State has more than cleared this bar by submitting the declaration of Catherine W. Brown, the Deputy Assistant Secretary for Intelligence Policy and Coordination in State's Bureau of Intelligence and Research. According to Brown, the existence or nonexistence of records relating to Plaintiff's request is a fact exempted from disclosure by Exemption 1 because that fact "is currently and properly classified under Section 1.4(c) of" Executive Order 13526, which pertains to intelligence activities, intelligence sources and methods, and cryptology. ECF No. 8-1 ¶ 7. Moreover, "[a]cknowledging the existence or nonexistence of responsive records would disclose information that . . . is currently and properly classified" under Section 1.2(a)(3) of that same Executive Order, "because it could reasonably be expected to reveal information about" those same topics "that would cause identifiable and describable damage to the national security." *Id.*

Brown explains in detail why this is so. In general, State considers "requests for classified information made by senior policy makers . . . highly sensitive and protected" because they can reveal insights into the policymaker's areas of interest, into deliberations within the Intelligence Community and with the policymaker, and into knowledge gaps within the U.S. government. *Id.* ¶ 8. Moreover, in this specific case, the records concern a "highly sensitive issue of clear counterintelligence interest," which "would reveal information that would allow U.S. adversaries to draw sensitive inferences about U.S. government awareness, or lack of awareness, about activities of counterintelligence concern, and therefore cause damage to national security." *Id.* ¶ 9. Specifically, acknowledgement of the existence or nonexistence of

the information requested would "reveal sensitive information concerning what a senior U.S. policy maker might or might not have known at a particular point in time about U.S. counterintelligence information and efforts related to Russian interference in the 2016 Presidential election." *Id.* ¶ 10.

For example, Brown explains, if State were to acknowledge that it had no responsive records, "a hostile foreign government might surmise that the U.S. Ambassador to the United Nations was unwitting of any interference in the relevant timeframe and from that draw inferences about her access to intelligence or the availability of relevant intelligence - information we would want to protect for counterintelligence purposes." *Id.* ¶ 11. But on the other hand, if State were to acknowledge that it possessed responsive records, "this could alert a hostile foreign government that its activities had been detected and/or to the time frame within which that detection occurred, as well as to information about the Ambassador's access to intelligence." *Id.* And "[t]his would be true even if we were to withhold the documents under a FOIA exemption." *Id.*

Brown also points out that unless State relied on a *Glomar* response here, multiple FOIA requests aimed at different senior government officials could end up allowing "an adversary to map out which of these government officials were or were not involved in relevant counterintelligence efforts based on which officials had responsive records. In other words, a U.S. adversary could potentially piece together key classified information about how the United States government conducts counterintelligence efforts based on responses to FOIA requests like this one." *Id.* ¶ 12. This is, as State argues, a version of the "mosaic" theory, which courts have long upheld as a basis for nondisclosure in the national security context. *See, e.g.*, *CIA v. Sims*, 471 U.S. 159, 178 (1985).

Finally, Brown also notes that if State acknowledged whether responsive records exist and argued that any such records should be withheld under a FOIA exemption, doing so could "reveal classified information regarding intelligence sources and methods." *Id.* ¶ 13. For example, any request directed to, or response received from, a particular Intelligence Community component that collects a particular kind of intelligence "could itself reveal details about the sources and methods of intelligence collection that were used, or not used, to obtain" responsive information. *Id.*

The Court finds that State's justification for its invocation of Exemption 1 is plausible and logical. Therefore, its *Glomar* response is sustained. *See Wolf*, 473 F.3d at 375.

### B. Exemption 3

State also argues that it properly withheld the existence or nonexistence of responsive records under Exemption 3. That exemption permits an agency to withhold records that are "specifically exempted from disclosure by statute," provided that the statute either "requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue; or . . . establishes particular criteria for withholding or refers to particular types of matters to be withheld." 5 U.S.C. § 552(b)(3). To determine whether Exemption 3 has been properly invoked, courts ask: (1) whether the statute in question is a statute of exemption; and, if so, (2) whether the information at issue satisfies the criteria in the statute. *See Sims*, 471 U.S. at 167.

Here, the Director of National Intelligence has, under his authority in Section 102A(i)(1) of the National Security Act of 1947, as amended, 50 U.S.C. § 3024(i)(1), "ordered the heads of Intelligence Community elements, including the Secretary of State, to '[p]rotect national intelligence and intelligence sources, methods and activities from unauthorized disclosure.'" ECF No. 8-1 ¶ 17 (quoting Intelligence Community Directive 700, at 3 (June 7, 2012), *available*

*at* http://www.dni.gov/files/documents/ICD/ICD_700.pdf). The National Security Act is without question an exempting statute that State may invoke for purposes of Exemption 3. *See Talbot v. CIA*, 578 F. Supp. 2d 24, 29 (D.D.C. 2008). And the D.C. Circuit has interpreted the second part of the *Sims* test broadly in this context, holding that an agency may withhold information if it "relates to intelligence sources and methods," *Larson v. Dep't of State*, 565 F.3d 857, 865 (D.C. Cir. 2009) (citing *Fitzgibbon v. CIA*, 911 F.2d 755, 762 (D.C. Cir. 1990)), or "can reasonably be expected to lead to unauthorized disclosure of intelligence sources and methods," *Halperin v. CIA*, 629 F.2d 144, 147 (D.C. Cir. 1980) (quoting *Halperin v. CIA*, No. 77-1859, slip op. at 5 (D.D.C. July 25, 1979)). For all the reasons already explained, Brown asserts, State may withhold the existence or nonexistence of responsive records under Exemption 3 because that information satisfies the criteria in the statute. For those same reasons, the Court agrees that State's *Glomar* response is justified on that basis as well.

### C. Plaintiff's Arguments

Plaintiff concedes that State's "brief meets all the standard criteria for establishing a *Glomar* defense . . . In any normal case, the government's brief and declaration would likely be sufficient to obtain judgment in its favor." Pl.'s Mot. at 4. It makes two main arguments in response, but neither has merit.

First, Plaintiff claims that because "the U.N. Ambassador does not have a known intelligence function," "State has not met the preliminary burden applicable somewhat uniquely to this case to show that the specific alleged counter-espionage activities of the former U.N. Ambassador would be considered ordinary government intelligence activity." *Id.* This is all wrong. Nothing about the merits of State's claimed exemptions turns on whether the U.N. Ambassador has a "known intelligence function." And the Court has no authority to place a

8

"preliminary burden" on State—let alone one "unique to this case"—to show that the activities that may have been undertaken by the U.N. Ambassador here were "ordinary intelligence activity." It suffices to say that nothing about Plaintiff's assertions undermines the Court's conclusion that State has plausibly and logically justified its assertion of Exemption 1 to cover the U.N. Ambassador's requests for intelligence about this sensitive counterintelligence matter directed to "any Intelligence Community member agency," as well as communications about those requests. In reaching this determination, the Court has no basis—as implicitly urged by Plaintiff—to question the reasons this Cabinet-level official at State may have had to request this intelligence, if indeed she did so. And neither do Plaintiff's assertions affect the Court's conclusion that State has properly invoked Exemption 3, because the information at issue manifestly "relates to intelligence sources and methods," *Larson*, 565 F.3d at 865, or "can reasonably be expected to lead to unauthorized disclosure of intelligence sources and methods," *Halperin*, 629 F.2d at 147 (quoting *Halperin*, No. 77-1859 at 5).

Second, Plaintiff argues that certain media reports undermine State's claims of Exemptions 1 and 3. Plaintiff notes that "[e]veryone knows about the Russian election investigation," and identifies a report that "[a] sitting Congressman has confirmed the former U.N. Ambassador was involved in unmasking requests." *Id.* at 6-7. But these reports do not cast doubt on State's asserted reasons why a *Glomar* response is necessary to protect sensitive intelligence interests or harm to the national security. Nor do they necessitate any response from State, since doing so would reveal they type of information its *Glomar* claim is intended to forestall. And finally, to the extent that Plaintiff asserts that State has somehow waived its right to claim these exemptions because of these media reports, an agency may only waive its FOIA rights though "'official and documented' disclosure" of the information at issue. *Frugone v.*

9

*CIA*, 169 F.3d 772, 774 (D.C. Cir. 1999) (quoting *Fitzgibbon*, 911 F.2d at 765). And such a disclosure cannot be "made by someone other than the agency from which the information is being sought." *Id.*

## IV.     Conclusion

For the above reasons, the Court will grant Defendant's Motion for Summary Judgment, ECF No. 8, and deny Plaintiff's Motion for Summary Judgment, ECF No. 9. A separate order will issue.

/s/ Timothy J. Kelly
TIMOTHY J. KELLY
United States District Judge

Date: March 13, 2019